The Honorable Pledges of the United States Court of Appeals in and for the 7th Judicial Circuit. Hear ye! Hear ye! Hear ye! All persons having business before this honorable court are admonished to draw near with their Good morning everyone. Our first case up this morning is N. Ray Ryan. Whenever you're ready. Good morning. My name is Claire Ann Richmond, attorney of Steinhilber Swanson LLP and I represent the appellants in this matter Rodney and Jill Ryan and Fortune and McGillis S.C. This is an appeal of an Eastern District of Wisconsin bankruptcy court decision which was appealed to the Eastern District of Wisconsin court and affirmed by that court. The issue is whether workers' compensation funds held in the debtor's attorney's trust account are property of the bankruptcy estate and whether those funds are exempt from the reach of creditors under the workers' compensation statute or as the lower courts have found are rather held in trust by the debtor's attorney for debtor's medical providers and not property of the estate and not subject to the protection of the Wisconsin statutes. In this case, Rodney Ryan entered into a compromise of his workers' compensation claim to settle with his employer and the insurer his claims under the workers' compensation statute. The compromise was much less than the claim. The compromise in the settlement compromise was that $150,000 would be paid to Rodney Ryan along with the 20% statutory fee to his attorney out of that amount. Another $400,000 would be put in the trust fund of Fortune and McGillis for disbursement to medical providers and lien holders. Now, Wisconsin law permits workers' compensation awards to be disbursed directly to medical providers. It certainly does and it was not done in this case. Well, it's put in this trust fund which designates medical providers and lien holders as the beneficiaries of the trust, right? Well, it doesn't say beneficiaries. It says for disbursement. For disbursement to them. What else could that mean? Well, there were no lien holders. It also said lien holders and everybody knew and we still know that the medical providers were owed well more than twice the amount that was being put in this account. Is there any evidence in the record that your clients did anything to attempt to pay these medical providers? I didn't see anything in the record after this trust was created. Yes. And that is in the record cited in one of our appeal briefs, either the reply or the initial brief. And it was not considered evidence by the judge in the bankruptcy court. What efforts are in there that either of your clients attempted to do? Fortune and McGillis attempted to negotiate a pro rata distribution at a lower amount than the entire amount, particularly with Dr. Purpa, and those possibilities were not able to be accomplished. The thing that's difficult about this case is that, first of all, as you say, it is permissible under Wisconsin law to, in a sense it's an override of the other provision of Wisconsin law that you rely on, under which workers' compensation awards are not going to be taken for the debts of parties. So we know about that statute. But the medical providers can have it. Now, it is a trust account of the firm, and so it's not too big of a stretch to think that it's a trust. So I can't understand, if there was some Wisconsin-based legal problem with this arrangement, why you didn't take it to the Wisconsin courts the minute it was recorded by the Wisconsin judge. And if there was no Wisconsin problem with this, then why shouldn't we agree with the bankruptcy court and the district court? Well, I think the difference in this case, in any Wisconsin case, my position is that these funds held in the debtor's attorney's trust account, that trust account is not for Dr. Purpa, the plaintiff in this matter. The attorney has an obligation in his eye over the trust account. Doesn't that happen all the time? I mean, doesn't that happen all the time, where an attorney's trust account will contain funds that are not just for the purpose of the client? Of course. And they are never dispersed unless you have permission from your client. Here, he has permission, right? Because he signed the settlement. That is the permission. That's it. But then he filed bankruptcy and he received a discharge of those debts. Mr. Ryan is not obligated to pay those debts. He discharged those debts. Right. He is not obligated to pay those debts. But the money is in the trust fund, which is obligated to pay those debts. That's the reason it's there. I believe— I just—it seems to me like he gave the money to somebody else, and then he filed bankruptcy and said, oh, I want that money back. And in fact, you can't take it. It's mine. He already gave it away. I don't know. How is he entitled to it? I believe that he is entitled to it because it was his compensation claim. I don't see this as any different as a personal injury case. Well, then he's entitled to his attorney's fees, the $30,000 statutory, in the exact same way. Those were already paid, and those were paid directly. So was the money to the trust. It's already there. The money to the trust has not been transferred to anybody else. It is for the benefit of the claimant whose money it was awarded to and is in the trust at that time. But there's a court order that says differently. There's a court order that says $40,000 of that is for disbursement to medical providers and lien holders, not for the benefit of the plaintiff. But it is still the claimant's claim. It's no different to me than getting a jury award on a personal injury case for a million dollars because you have pain and suffering and medical bills and you get that money? No, I think it is different. I mean, trusts all the time will have limited purposes that the monies in the trust can be used for. Somebody might set up a college trust for their kid, and so they've put money in the trust and only certain people can be paid from it. And it looks to me like whether you call him the beneficiary but with a restriction that the money can be paid only to the medical providers or whether you just say that the beneficiaries directly are the medical providers, he doesn't have an interest in this money anymore. I disagree with that. I think that he has absolute interest in that, and he has a claim to it under the IOLTA trust fund rules. And why would he settle to give the medical providers as much as a nickel if, as you say, the debts have been fully discharged in bankruptcy and this $400,000 is actually his? Why didn't the settlement just say he gets $520,000? When he settled, he had not filed bankruptcy. We don't know his intent, and it's not in evidence that he intended to file bankruptcy at the time he settled. We do know that he had debt of greatly in excess of this $400,000. Yeah, about double. We know that he was unable to work because of his injuries and was unemployed, and we know that a foreclosure judgment had been entered to foreclose the home that he and his wife were living in. So there were other circumstances that were happening with regard to his life and regard to this debt. But in practice, if there is an award that is to be held for the benefit of a third party, that goes into a separate escrow trust account. But why does that matter to the purpose of the funds? You're quibbling about how many escrow accounts there were, how many trust accounts there were, and I'm not sure that is actually pertinent to the legal issue before us. I'm quibbling about the type of account that it is. An IOLTA trust account is the property of the debtor. In fact, as a bankruptcy attorney, I would never not list as property of the estate money held in an attorney's trust account that had to do with that debtor's claim. But it's not just in an attorney's trust account. There's a court order which takes this out of just the normal trust account, a court order that was a result of the settlement in the workers' compensation claim saying that this is for disbursement to the medical providers. I see that as the debtor needs to pay medical bills, and here's some money for the debtor to pay his medical bills. That's not what this says. But then the debtor discharged them. It says for disbursement. It doesn't say that it's for the medical providers. So here's the other place that this goes that doesn't make sense to me if this happens as an attorney who may be holding that money in my account. Now, Dr. Purpa comes to take all of the money. If I'm really all of a sudden a trustee for anybody who's going to make a medical claim and additionally the subrogation people who are coming out of the woodwork to make subrogated claims that were not even listed in the schedules, if all of a sudden as attorney I'm trustee to all of those creditors and I have a trustee's obligation, now what happens with my obligation when Dr. Purpa files a state law claim to get all of the money? Well, instantly. I mean, you know, that's what interpleader is for. I mean, if there's this $400,000 and there are a lot of different people who say it's mine, normally you're allowed to pay that into the court or in some way freeze it so that, of course, no one winds up having to pay $800,000. It's only $400,000, and maybe Dr. Purpa is not entitled to all of it. But I understood that the Wisconsin courts are right now trying to sort that out. Right. Isn't there a state case right now trying to sort out which medical providers are owed what? That would address that issue. I don't think that does address that issue. I think that the problem with this issue is that inside or outside bankruptcy, does a claimant's attorney have an obligation as a trustee that the medical providers are now the beneficiary of the money awarded to the claimant? This is an administrative law order. That's a separate issue. If we affirm the bankruptcy court here, how it's determined who gets what of the $400,000 is a separate issue than whether or not a trust has been created that that $400,000 goes to medical providers in the first instance. And that is something that Judge Wood said could be resolved through the state courts. Yes, and there is a state court action pending in this, which is staying. My problem with that is that affirming this decision tells all claimant's attorneys that they also have a fiduciary obligation to the claimant's creditors. And that does not sound right to me as an attorney who represents an advocate. Well, that doesn't say that at all because what did Mr. Fortune say when you asked him that question? What question? Well, he agreed to the settlement. I mean, he was the lawyer that represented your client, Mr. Ryan, at the settlement. He agreed to it. He expected to be able to do what they do in all the workers' compensation claims that they manage like this. He expected to go to the medical providers, say, this is all I have. Why couldn't he do that? He did. What changed? He did it and it was unsuccessful. Okay, but didn't he anticipate that it might? He had, what, $1.2 million in medical bills and he had $400,000 to pay it? Didn't he anticipate that he was going to get some resistance from some of these doctors when he said, hey, you've got to take a haircut of several hundred thousand dollars on your medical bills? I think that in the workers' compensation arena where these medical providers provide workers' compensation services, that is not unusual that they have to only take within the limits of what is paid by the workers' compensation insurer and the employer. I don't think that is an unusual expectation. I guess what's different here, it seems to me like you're asking us to bail out Mr. Fortune for the deal he struck. I'm not sure why we should do that and I'm not sure what is different here from a normal claim. Just as if Mr. Ryan had not filed for bankruptcy, Mr. Fortune would be in the exact same situation as he's in right now. I'm asking two things. I'm asking, one, that a workers' compensation claimant who is awarded a claim because he has medical bills and he gets some money for payment of those medical bills, that those medical bills in the hands of his attorney's trust account are not a fiduciary obligation to his creditors and that those are protected under the Wisconsin statute. I would completely agree with you if he got the money to pay the medical bills. He didn't. That's the problem here. He entered into a settlement agreement where he said, take $400,000. I give it away. It's gone. It's not mine. It's in an account to pay the doctors. If he had said, give it to me and then I'll negotiate with the doctors and maybe I'll pay my medical bills and maybe I wouldn't, that's a totally different agreement that I suspect the employer and the insurer would have never agreed with. Actually, that is exactly the agreement that was the intent of the employer and the insurer and the administrative officer. That's not what the plain language says. And how can it be appropriate to enter into a settlement where this money is supposed to be dispersed to the medical providers and now Mr. Ryan goes and gets it discharged and wants to keep the money for himself? That happens all the time in bankruptcy. Not when there's a court order saying that the chunk of the money from the workers' comp is for disbursement to medical providers. That's a very different scenario than what happens all the time in bankruptcy. I assert that the account that was set up was an account that was intended to be under the control of the debtor and the debtor's counsel for what they did with the money. That is not what the language of the court order says, which is what your problem is. You're way into your rebuttal time, if you want to save a bit. May I save the remaining 30 seconds for rebuttal? I'll give you a little bit more. Yes. Thank you. Thank you. Mr. Posnanski? Good morning. Good morning. My name is Tim Posnanski. I'm with Hush Blackwell. I have the privilege of representing Bronco Purpa MD, LLC. Why should all of this money go to Dr. Purpa? There are lots of other medical providers, too, with approximately, in the aggregate, the same amount of money at stake. There certainly are, Your Honor. That is the subject of a pending state court action. Once the bankruptcy court determined that these funds were not property of the estate, the bankruptcy court, in my view, properly determined it, had no further jurisdiction to determine what would happen with these proceeds. So here's another way of looking at this. I'm not sure if it would, in the end, influence who gets paid what, but one could imagine, looking at that court order, that it creates a trust with Mr. Ryan as the beneficiary, and in that way is a standard IOLTA trust, but it's a restricted trust. As the beneficiary, the only thing he can use the funds for is to pay his medical providers and lien holders. So it's like you set up a trust for your kid to go to college, and the money can't be spent on a European vacation. It's for college, and that's the only thing it can be spent for. So that would mean that this money is part of the bankruptcy estate, even though it has to be spent only for the medical providers. I suppose if that were the determination, it could. Here, I think it is a little bit different, Your Honor, in that the funds were set aside in the trust account, paid to Mr. Fortune's firm. Pre-bankruptcy, right. Pre-bankruptcy for disbursement to the medical providers. And so they were never pulled into the bankruptcy estate to begin with? Each of the medical providers who were owed were included in the bankruptcy file. Yes, they filed claims in the bankruptcy. And was the $400,000 listed as one of Mr. Ryan's assets? The $400,000 were included on Mr. Ryan's schedules as an asset that were then, he attempted to exempt those funds through the application of 102.27. Right, right, and that wasn't there. Yeah, I mean, I think it's a little complicated. The one other quibble I had with this, which, again, I'm not sure makes any bottom line difference, but the lower courts just kind of breezed through and said Mr. Ryan's residual interest, his remainder interest in this, if anything was left over, was so trivial that it could just be disregarded. And I'm not sure that's right. I mean, you know, you never know. Maybe the other medical providers don't act soon enough. There's some limitations problem in paying them, or maybe some other unexpected issues come up. What harm would it be to say that there is this remainder interest, even though the odds of it ever coming into fruition are extremely low? You know, I think what ultimately happened here was that the chances that there would be any remainder were so insignificant here. And even Mr. Fortune, in his briefing, admitted that. He admitted that his negotiations before entering into this compromise agreement with the medical providers were futile. That was his words. So there was no expectation. There could be no reasonable expectation that there would be any remainder after disbursing the two medical providers. So what's the point of that last sentence in the court's order, being understood that any balance remaining, Mr. Ryan gets 80 percent, Fortune gets 20 percent? That's just fluff? Well, I don't think it's fluff. Consistently, we've argued that the words need to be given meaning, and they're not surpluses. That would apply to these words, too. Which would mean that there would be this somewhat theoretical interest contingent on, again, everything going. If everything broke Mr. Ryan's way, is it at least theoretically possible that there would be something left over? Theoretically, I think there is. Go ahead. Would that impact Mr. Ryan's interest at all in the state court action? If he does have a remaining equitable interest in whatever is left, which may be nothing. It may just be theoretical. But if he does have that equitable interest, does that give him a greater voice in the state court proceeding over the $400,000? I think in the state court proceeding, and I would agree with the court, that the proper way to handle this is through an interpleader, whether that's providing notice to all the medical providers or having the court provide notice to the medical providers to assert a claim. Those who assert their claim would be treated on a pro rata basis. Those who didn't would forfeit their right to any of the proceeds. And to the extent there were any proceeds remaining for Mr. Ryan, I think the agreement should be given its meaning, and those funds turned over to Mr. Ryan. Under the circumstances, that wouldn't happen. I mean, just with the value of the claims, the value of my client's claim alone exceeds $400,000, let alone his costs incurred in having to pursue this. So I don't think if this were to go all the way through and play its course in the state court proceeding, there actually would be any funds left. But would it matter if we affirmed that he had an equitable interest in whatever was left? Would that give him any greater standing or rights in the state court? I don't think so. I mean, he has those rights. He can assert those rights in state court now. In fact, as we pointed out in our brief, the rights he's asserted in state court are a little bit different than what he's argued to the bankruptcy court, the district court, and now this court. So he has standing to assert his claim or whatever rights he believes he has in and to the $400,000 that remain in his attorney's trust account. Will you remind me the date of the settlement? The date of the settlement was September 17th, 2019. And what was the date of the bankruptcy filing? October 11th, 2019, so less than a month after the date the settlement was reached. In the bankruptcy court, in the adversary proceeding, did he use that remainder interest to try to argue that the entire $400,000 should have been part of the bankruptcy estate? He argued a number of things with respect to the $400,000 in front of the bankruptcy court. No, no, no, no. I'm saying just with the 80-20 split. Did he try to use that 80-20? Whatever's left, 80% is mine, 20% goes to my lawyer. And that little clause in the settlement agreement results in the entire $400,000 being part of the bankruptcy estate, so I get it all. He did not. His argument was a little bit different. He essentially said that the agreement in some ways was illusory and it was all his and was always his, and he had unfettered discretion to do with it as he pleased, including paying medical providers. I think the words that his attorneys used at the time were at his leisure. But that's not the way. Didn't he agree, though, that the Medicare part? Wasn't there a little Medicare part of this, too? He did agree that that had been set aside, that he had no interest in those funds. Right, and there's a little inconsistency there, I think, in position. I would agree. I think there's also inconsistency with how he treated the funds that were paid directly to his attorneys, which he argued were his attorneys' funds and not his. You indicated in your brief that the Fortune and McGillis firm paid itself $80,000 out of that $400,000 amount. It was unclear to me. Was that put back in, or what's the status of that? That's been unclear to us as well, Your Honor. The explanation, as far as I understand it, was that that was really just a discrepancy in the schedules initially that we misinterpreted potentially, that his attorneys had looked at this agreement and decided that $80,000 should go to Attorney Fortune as part of the split from the remainder. And so, in the initial schedules, it reflected as though that $80,000 had been paid. We've never been able to get to the bottom of whether there were funds moved out of the trust account into the Fortune and McGillis operating account. That would be subject to discovery. We've never had the opportunity to do. I'm not sure how, from the reading of this, they could get $80,000 out of the $400,000. Well, I would agree. The issue is that's how the schedules reflected it. Our understanding was that it was Mr. Ryan's understanding that his attorney was owed or entitled to an additional $80,000, and that's what was reflected in the schedules. With respect to one issue that the Court just raised, it gives rise to another one of our arguments, and it follows the timeline. What has never made much sense to me is the appellants have never sought the most direct and simple way to resolve this matter if their interpretation of the compromise agreement and order were correct. Under the stipulation that he had entered in the order itself, Mr. Ryan had the right to petition the Division of Hearings and Appeals to set aside or modify the order. So he could have sought some clarification that he had never intended to set aside these funds for the benefit of medical providers. So it seems to me, though, that his response would be that this was just a standard pre-petition arrangement. The bankruptcy comes in. Bankruptcies frequently upset pre-petition arrangements. Sometimes things are unwound. Sometimes things go into estates. And so there was no duty to exhaust things all the way through to the highest state court in this circumstance, and it was really for the federal bankruptcy court and on up the chain to sort out what was going on. I don't disagree. There was certainly no duty that he do so. I just don't think it's consistent. It was not necessarily petitioning to the highest court. It's petitioning back to the same court that approved this order based upon the stipulation. And what's more, Your Honor, and why I don't think it makes much sense is his attorney actually advocated that the bankruptcy court reach out to the administrative law judge to seek what the administrative law judge intended in approving this order. Well, if that was your position, why on earth wouldn't you take the simple step of petitioning the judge himself to explain that this was not the intent of the parties and somehow this was misconstrued? Are there procedural barriers, though, or were there at the relevant time? Sometimes, you know, even the Office of Workers' Compensation hearings might not want people to come back constantly pestering them to clarify orders. There's usually a certain time period in which you can do that. That's correct. There is a time period, Your Honor. However, he was well within the time period in order to do so. As set forth in the stipulation and the order itself, he had one year to petition to set aside or modify the terms of the order. The order was entered on September 17th. The bankruptcy was filed on October 11th. Our complaint and objection to the exemption contending on its face that these funds were held in trust for the benefit of medical providers was filed on December 16th, 2019, so two months after the bankruptcy had been filed and three months after the order itself had been approved. We moved for summary judgment on June 24th, 2020, and we even had the initial oral argument in front of the bankruptcy court on September 9th, 2020. So he still had eight days after the oral argument in front of the bankruptcy court, after the judge had rejected his invitation to seek counsel from the administrative law judge to move for clarification or to modify the terms of the order, and they didn't do so. The district court and the bankruptcy court properly determined there were no genuine issues of material fact and that my client was entitled to judgment as a matter of law. The record on summary judgment for the bankruptcy court was quite limited, as the bankruptcy court found in its decision. It consisted of the compromise agreement, the workers' compensation hearings order, and the debtors' petition and schedules. Mr. Fortune had attempted to introduce a litany of evidence regarding negotiations prior to the entry of the order, presumably with the intention of arguing about the party's intent, notwithstanding they had initially contended that the terms were plain and unambiguous. So there was no evidence admitted about the negotiations with the medical providers, though in his brief, as I indicated before, Mr. Fortune did characterize his negotiations with the medical providers as futile. But I take it that you would agree that what this particular legal proceeding is going to determine is just, you know, what was in the bankruptcy estate, what was exempt. We're not, we can't and are not being asked to decide whether Dr. Purpa gets the full 400 or whether it winds up being spread out among the other medical providers. Is that right? That is correct, Your Honor. We will take that issue up with Judge Fredrickson in Racine County. Okay. I would also note that there are several inconsistencies and the appellants have been relatively inconsistent throughout these proceedings, initially arguing that the language used in the order and the stipulation were plain and unambiguous, only to reverse course in front of the bankruptcy court and contend that actually the terms, although they didn't identify which terms, were ambiguous, and this actually constituted what they phrased was a wink-wink agreement and even admitted that there was no intention by any of the parties when they entered into the agreement that said these funds should be dispersed to medical providers to actually do so. I think that conduct in and of itself also justifies the imposition of a constructive trust. I think that is the wrongful conduct that the court would need to find and that the bankruptcy court certainly found. In closing, I do believe that the bankruptcy court and district court properly determined that my client was entitled to judgment as a matter of law and we would ask that this court affirm that decision. Thank you. Ms. Richmond, we'll give you a minute. Thank you. I would like to comment on a couple of things that were brought up. One, the remainder language. The remainder language was not just fluff. The remainder language is actually the language that demonstrates the intent of this agreement to be here. This is the claimant's award. The claimant gets $400,000 to use because he has all of these medical bills out. Claimant, you go out and you figure out what you're going to do about him. But why would he ever pay any of them if they've all been discharged? Because this would be the same outside bankruptcy. Outside bankruptcy, if he didn't pay them and he would just go on a vacation with the money instead of paying them and coming to some settlement with them, he would be sued and there would be judgments against him. But outside of bankruptcy, there are valid debts. That's why he'd be sued. But if they've been discharged in bankruptcy, what right do the doctors have to collect them? They have no right to collect them after discharge in bankruptcy, but the settlement agreement was not based upon bankruptcy and there was no bankruptcy at the time that that happened. So if the settlement agreement is standalone and sufficient to secure the right of the medical providers to that $400,000, I don't know why what Judge Kirsch is saying doesn't kick in. That's just not his money to dispose of as he wishes anymore. I do not believe that the medical providers are a party to this. I do not believe that they are beneficiaries of this action. That money is to the claimant, is awarded by an administrative law judge who does not set up trust. No trust was set up. It was awarded to the claimant because he had medical bills that needed to be paid. And the reason there is always an 80-20 is because the workers' comp attorney goes out and he negotiates, and whatever he negotiates that allows some of that $400,000 to be left is split between him and his client 80-20, and that's his incentive to still work taking care of that file and to be paid by trying to have some remaining funds left that he gets 20% of and his client still gets 80% of. Okay, thank you, Ms. Richmond. I think we understand your arguments. The case will be taken under advisement.